All right, the next case we're going to hear is Scinto v. Warden. Mr. Farro, when you're ready, we'll hear from you. Good morning, and may it please the Court. Appellant Paul Scinto asserts three Eighth Amendment claims against the warden Patricia Stansberry, the prison doctor Dr. Derek Phillip, and the camp administrator Susan McClintock. I'd like to touch on all three claims this morning, but I'd like to focus the discussion on what I think are the three fundamental errors that the district court committed and talk about the case through the prism of those errors. Can you talk just a little louder? Thanks. Sure. Sorry, Judge Watts. That's all right. The first error was that the court resolved credibility determinations at summary judgment and usurped the role of the jury. And I think the clearest example of that happens with respect to Mr. Scinto's second claim, which we brief as the second claim, that the camp administrator Susan McClintock and the doctor Derek Phillip, when they came upon his cell, found him vomiting blood, vomiting, and abdominal pain doubled over, that they provided him with no medical assessment whatsoever and simply sent him to segregated housing or the SHU, as we refer to in the papers. And I think that that is a very kind of simple and straightforward misapplication of the summary judgment standard, because if Mr. Scinto's testimony and paper submissions, his affidavit, is credited, then the outward manifestations of his illnesses should have put the prison doctor and the camp administrator on notice that he was in need of at least a medical assessment and, therefore, that they should have provided that medical assessment to him, and by not doing so, that they were deliberately indifferent to what, as this Court has said and other circuits have said, is an obvious lay person would interpret as necessitating medical attention. With the written record, he clearly had some kind of colitis at the time and had been vomiting, and maybe there was some blood in the vomit. I don't know. That could be a disputed question. But when he made a complaint about that incident, he said they conducted a lockdown while the water was turned off and he needed water. And when the prison authorities wrote it up, they said he complained about not having water and that they should have locked down. And the prison authorities then reacted to say that is not the appropriate emergency to say you needed water. There was no suggestion by anybody that he needed medical attention at that time. And my question is how do you elevate that record into what you're suggesting? I think, Judge Niemeyer, that that is the dispute. Your question kind of finished where I was going, which is if Mr. Sinto's testimony is credited, and I will submit to you that I don't think Mr. Sinto had a contemporaneous assessment of what his manifestations were at that time, though he does write about it in the context of others. His manifestations, he wrote up his complaint, and in his complaint, he said I couldn't get water, I wanted water, complained about water. Right. And that's all he complained about in that instance. He thought it was unconscionable to have a lockdown at the same time they shut off the water. That was his complaint. I don't agree that that's the record, Judge Niemeyer. I think his testimony was. Not the testimony. I'm talking about his complaint he made to the prison authorities at the time. So I think that, well, I mean, I don't think that he's constrained to that. And then he wrote it up. I mean, you know, he wrote. But he's not constrained. But now you're talking about whether this is an Eighth Amendment violation and whether the prison authorities were unconscionable. I mean, the standard for Eighth Amendment is pretty significant. And if he's sitting there complaining that I needed water and you guys are dopes for not keeping the water on while we're locked down, that's a lot of different claim, and that's all he's complaining about. And that's the way the prison took it, too. You're making it that there was a deliberate indifference to a medical condition. I think the premise of his complaint was there was a component of it that he wanted water. But, you know, the kind of predicate to it can't be ignored, which is he wanted water because he had knowledge that he had gallstones, that he had been diagnosed with it. He had not. He was diagnosed with gallstones a month later. I think that actually the gallstones show up both in July and then later on. He said it was colitis or colitis, whatever. I can't figure out what the word they used, he uses, but I've always understood what he's describing as colitis. Sure. And, you know, let me say at the outset, you know, he was a pro se litigant, so I recognize that the record is a little bit difficult sometimes to parse. I'm happy to get the pin sites. Regardless of whether the gallstones were diagnosed before or after, the predicate, as I was answering your question earlier, Judge Niemeyer, said he was in severe abdominal pain. He was vomiting. He was vomiting blood. He was incontinent. He elicited testimony. This is what makes these cases really difficult, particularly when you're dealing with prison-type situations and the quantum of proof and the type of evidence that's there. In this instance, we do have the initial statement that's being made, unsworn. I don't know what circumstance is being made. And then you actually have a deposition, which you seem to allude to. And it's no question that deposition creates some form of issue of fact here. It becomes a credibility question. And if we take the position that as a matter of law that first statement keeps you from making additional statements about it under oath, I don't know where that takes us. But that's why these cases, and it's kind of scary in some way because it simply says you don't think that just an affidavit or a statement alone by a prisoner should put you in trial in every instance beyond subpoena judgment. But if it is sworn and if there's something that goes with it, at the very least, whether that's required or not, it seems to give something there. And if I understand your argument, that's kind of where we are. He's made these complaints about these physical ailments. No question they occurred. The question is the significance of it. Was it the water or was it he didn't need aid? He says in the sworn statement he did. And the records, they are records that sort of stand up to the fact he had ailments. And the question is, is that enough for summary judgment? Then it becomes a very easy question. It's not a question of whether I hear when ultimately or not. For summary judgment, it's that kind of thing when you're in a case on summary judgment without having the benefit of something different. You could have gone on and maybe taken some more evidence, had a direct verdict, but done other things there. But to do it in summary judgment, I don't know how we distinguish a prison case from any other case like this. I agree with that. And I think your question hits right on the dilemma in these cases. And the Seventh Circuit recently issued an en banc opinion about three weeks ago in which it kind of calls up this point directly, which is these prison cases are always he said, they said, not he said, she said, he said, you know, he said, he said, they said. And then there's plenty of documentary evidence by the prison officials. He said, he said, she said. There's a lot of not just prison cases. The question is, are these a special type of case? Because it really does indicate, oh, we could be really hit with this because there's every incentive to issue a deposition of some sort because you're in prison. The question is, should we require something more than just a naked statement that something happened? And if that's so, is that here? I think it seems to me that might be the only limit. And I don't know what that more could be. Sure. If I understand your question, Judge Wing, do we add a testimony plus essentially requirement in prison cases in order to create sufficient quantum of proof to create a genuine dispute of material fact? And I don't think there's any case that says that there is more proof required of an inmate in order to create a genuine dispute of material fact than there is in any other civil case. And I think you have to find it was patently incredible. That was just incredible. His statements that were made there and that would stand up, that in and of itself could be it. But it had to be some basis for saying that other than the fact that he's in prison and he made a statement. I mean, his testimony under oath is that he was in severe pain, that he was vomiting, that he was vomiting blood. There was documentary submissions, not in the exact way that Judge Niemeyer has asked about. But there are documentary submissions at the time that he's in pain, vomiting, vomiting blood. He wants to know. I think he was trying to litigate that issue through his disciplinary hearing, which is how some of the documentary evidence comes into the record. I mean, you know, I agree that up until the way the case is litigated is not the way that the case that he envisioned it being litigated 10 years ago. But now what we have is our summary judgment record, and we have a conflict of testimonies to that point. Some of the other disputes, I think, that preclude summary judgment were, for example, a dispute about whether he could manage his diet while he was in segregated housing. The government kind of asserts, and Warden Stansberry in her response to the congressman says, that Mr. Sinto had education about the ability to select it, the proper diet that he would need in order to manage his diabetic condition. Mr. Sinto testified, and there was, I think, a documentary submission that he couldn't manage it because the food offering was the same. And the drink, for example, that he was offered was always just sweet orangeade-type drink, which you don't have to know a lot about diabetes to know that a sugary drink that's offered to you every single day doesn't give you much choice about whether you take the drink or not. And, you know, some of these kind of disputes percolate throughout the entirety of the record. The question of what happened on June 14th between Mr. Sinto and Dr. Derek Phillip is, again, disputed. Now, it's not disputed that he denied him insulin. It's not disputed that he denied him insulin for a nonmedical reason. But it is disputed about the extent of his behavior at that particular incident. Dr. Phillip testified that, you know, he was angry and hostile. Mr. Sinto testified that it wasn't quite that bad. Yeah, he had a tone, but there was no security guard ordered to throw him out. And when he was asked to leave, he left. There's a dispute of fact about whether or not it was appropriate or, well, that's a question of law, but I think the dispute of fact is about whether what happened. Was it, you know, actually an angry and hostile and aggressive circumstance? Or was it Mr. Sinto simply giving an angry tone because he was being denied the insulin that he thought he needed at that point in time and that he was told that he was needed by Dr. Phillip according to his prescribed regimen of providing him insulin key to his blood sugar? I'd like to move on to the second error, which I think is a kind of cleaner legal issue, which is, is there a substantial harm requirement imposed in these Eighth Amendment cases? And it's not actually just a substantial harm requirement, at least that's not the way the district court interpreted it. The district court applied a substantial harm expert medical testimony requirement, and it said that if Mr. Sinto did not provide expert medical testimony that at the times that he was denied insulin, his blood sugar skyrocketed or he suffered some type of substantial harm, then he cannot in any way, then he can't make his claim. That is a completely foreign concept. I've never really seen a case like that. I have seen cases that in a delay case sometimes you have to show that there's substantial harm. For example, if you are scheduled for a surgery and the doctor delays the surgery for a long period of time but gives you some type of pain medication, maybe in those. I read the state is making a delay claim. You read that it's not judgments or that it is? He's saying that this was just a delay case. So what do you have to say about that? Yeah, I think it's not. I think it's straight up not. Because? Because there are a couple of reasons. First is because Mr. Sinto submitted another request to Dr. Phillips seven days after the June 14th incident, again asking for insulin, saying, I haven't been given my insulin, please provide the insulin. He repeats his request in July, saying, please give me the insulin consistent with how I articulated in June. I really do need the insulin. He testified that the June 14th incident was not the first time he had received insulin. This isn't a question about not receiving insulin on one occasion and receiving it later that night. His claim is that he was intermittently denied insulin over a period, it sounds like from June until December, or until September. You're talking about the supplement because his sugar was up to 200 and he needed four additional units. He testified clearly that he had always received the 100 or 120 units. But he was claiming that he was denied the four additional units based on his high sugar level. And he was denied it at the time of the meeting. But, as you know, the doctor added in his notes on that very day that the patient should be monitored. So I think the June 14th incident is a dispute about supplemental insulin. I agree with you, Judge Niemeyer. But Mr. Cento's testimony is that, you know, he was intermittently denied insulin over a period of time, whether that is just talking about supplemental insulin or always the original. It was first a supplement. He came in and said, I have, under his own version, it's up to 200. And he's, as the sliding scale entitles him, to four additional units. Sure. Right. So if I, you know, I think regardless, the point is that if he's being denied supplemental insulin intermittently from a period of June until September when he's placed in the SHU, you know, that creates a deliberate indifference claim. And it answers, I think, your question, Judge Montras, is that it's not just a delay case, that it's something more than that, that there's an on and off switch for when you get supplemental insulin. And, you know, the only thing I'd add on that point, and then I'm happy to move on, is that the Seventh Circuit issued an opinion in May of this year after the briefing was over, or maybe right before we filed the reply, when it has a, I think, kind of interesting reasoning in its claim. The case is McDonald, and the citation is 821F3-882. And the court writes, Custodians are not excused from ensuring adequate treatment for inmates with chronic or degenerative conditions simply because any resulting harms may remain latent or have not yet reached the point of causing acute or life-threatening injuries. And it talks about high cholesterol in that particular context, but then it has a string site, which includes vomiting, hepatitis C, diabetes, and hypertension. So I think to the extent the court makes, you know, air doubles down with the government on this theory that you need an expert medical testimony about a substantial harm in order to make an Eighth Amendment claim, it will create a circuit split and will be the first court to have done so. The last error that I think the district court committed was that it misapplied the deliberate indifference standard. And the government doesn't take, I think, exactly this point. It takes kind of a variation on it. But my understanding of the government's opinion is that not only does the prison official have to be deliberately indifferent to an objectively serious medical need, but that in order to be deliberately indifferent, the prison official has to know all the intricacies of whatever the objective serious medical need is. So you have to know not only that diabetes needs to be managed with insulin, but you need to know what the harm is that could happen if you are denied insulin, or that if you give somebody nothing but a high-sugar diet who has insulin, you have to know the types of harms that could occur from consistently denying an inmate other types of diets that would be necessary to regulate their diet. And I've never really seen a case that places the bar so high, and especially not in the insulin context, where you have a slew of cases that the government does not talk about in its brief. In particular, the Lawley case from the Ninth Circuit, which says because of the prevalence of insulin, because there are 18 million Americans who have it, because it's become kind of a part of the, you know, like WebMD world of knowledge of common people about medical ailments, that most people know, we can kind of, the courts kind of assume almost as a matter of law, that most people know that diabetes needs to be actively managed, and that it needs to be actively managed with insulin, a diet, exercise, and that if it's not, then because it's a chronic condition it needs to be actively managed, that it can create harms in the future. What those harms are, I don't think a prison official needs to know every single type of harm that could happen in order to be deliberately indifferent. I think they simply need to know that the inmate was an insulin-dependent diabetic, and that the, you know, full stop. If there is a need that is related to that diabetes that, you know, that the court can assume is appropriate in those circumstances, such as insulin or a diet, then those are sufficient for making out an Eighth Amendment claim. There are no other questions. I'll reserve the balance of my time. All right. Mr. Dodson. Good morning, Your Honors. My name is Robert Dodson. I represent the Appalachian prison officials in this case. I'd like to start by addressing each of the incidents in turn, unless the court would like me to go otherwise. I would note that out of the many issues that Mr. Cento first raised in his complaint ten years ago, including a treatment of a knee infection, hepatitis C, prison housing assignments, work assignments, this appeal has been narrowed down to these three issues. The first being the medical encounter with Dr. Phillip in June of 2005. It is undisputed that Mr. Cento has diabetes and that Dr. Phillip was actively treating Mr. Cento for that diabetes and that he had prescribed a regimen of care, including the sliding scale that's at issue with that particular fact situation. It's undisputed that Mr. Cento showed up at the prison's medical clinic. He described himself as being angry and demanding that he receive the supplemental insulin. The nurse on call at the time referred Mr. Cento to Dr. Phillip, and we had this encounter that ensues. Mr. Cento, again, admits he's angry. Dr. Phillip notes in the record that Mr. Cento is aggressive, he's shouting, and he's threatening. I think context is important here because Dr. Phillip practices medicine in a federal prison, and at the same time he's practicing medicine, he has to be concerned about the safety and security of himself, as well as other staff members, inmates, and the public at large. So taking it in that context, I think the Eighth Amendment has never required a prison doctor to treat an actively angry, threatening, and aggressive inmate at that exact moment. I don't know about that. I mean, have you found some law about that? It seems to me, for example, to take it out of this case, suppose some man for some reason had some severe bleeding and he was really angry and really big, do you think the prison doctor could just walk away? No, Your Honor, I don't think that. So I don't think that that makes an excuse. I mean, maybe this is a different case, but your general principle was that the prison doctor doesn't have to treat somebody who's angry. I don't think that's true. I may have misspoke. I don't think in this context it requires Dr. Phillip to treat Mr. Cento. Is it the problem that we don't know exactly what the context is, that we have disputes as to that? I mean, for example, your colleague said that the doctor never called for someone to subdue, that the record shows he never called for someone to subdue the plaintiff. Is that correct? That is correct. So that's some indication that maybe it wasn't life-threatening, however angry the plaintiff was. Well, I do know that all prison workers, and this is a part of federal regulations, are required to de-escalate a situation using the lowest form of force necessary. And if the lowest form in this situation is that he simply terminates the visit and asks Mr. Cento to leave, that there's no requirement to call in the Calvary. No, of course not. But the very fact of your definition means that the lowest possible form of action was sufficient to get rid of this situation, however aggressive it was. Right. It was maybe in this situation, but there aren't any facts that would, you know, say Mr. Cento refused to leave. Then maybe the next step would have been for Dr. Phillips. Well, why are you spending all your time on that? It seems to me that's disputed, number one. And number two, it looks to me like the doctor terminated that method of communicating or treating the prisoner, but he did put in a note that says ordered the monitoring of him. And that's where I was going next, Your Honor. I thought your idea was that the particular form of communication that the doctor found distasteful and couldn't go through with, I don't think it would entitle him not to treat. He just chose to treat him through issuing a directive, let's monitor him and provide what's necessary. That is true. This is not a case in where Dr. Phillips denied Mr. Cento treatment. Well, but the allegation is that he was. That may be true. Maybe they did monitor him, but he makes allegations that he was periodically denied this. Doesn't he? Well, he makes the allegation much later, and even I would assert that it might be. What do you mean much later? At the time that he wrote this complaint and throughout this litigation, he has focused on Dr. Phillips asking him to leave the clinic. Later to sort of build his case, he talks about being intermittently denied insulin, but this appeal focuses on the one incident. Is the evidence that he, how did he make this? Did he have a sworn statement? Was his deposition taken? His deposition was taken, Your Honor. I don't know about you, but a lot of times in litigation, new evidence has come up in depositions. And indeed, sometimes new evidence comes up at trial. Sure. Sometimes from your own client decided never to tell you something. Sure. Decides to tell that at trial. I think here, you know, with this situation, Dr. Phillips had a treatment regimen for Mr. Cento. And he followed that. He says. He says, and he followed that. He issued the sliding scale, and Mr. Cento, at summary judgment, you know, Mr. Cento is required under Rule 56 to show that officials knew of the condition, which Dr. Phillips did because he provided the sliding scale. But what isn't clear is that Mr. Cento, he hasn't even established that he even needed supplemental insulin when he showed up at the appointment. Well, he says he did. And to combat that, Dr. Phillips wrote an order, and Dr. Phillips testified to this, and it's sort of common knowledge, that doctors write prescriptions, and nurses and other medical professionals carry out those. He wrote an order in the note immediately after this incident that Mr. Phillips, I'm sorry, Mr. Cento was to be monitored by nurses and given supplemental insulin as needed. That meets Dr. Phillips' obligations at that time. And so it's not a fact that he withheld this insulin. He actually followed through in his own treatment plan and ordered nurses and other professionals to follow through. And if Mr. Cento never received that insulin, perhaps he named the wrong people in this complaint. But Dr. Phillips did his obligation at the time, which was to ensure treatment and follow through on his own treatment plan. Yeah, maybe so. Maybe he'll be able to persuade a prior effect of that. But go back to my bloody prisoner. The doctor is unhappy with him, so he leaves the room and he says to the nurse, and what you see to this, and the nurse doesn't do that. Don't you think the doctor has some liability there? There's some slippery slope here, and I think that calls for a factual analysis on the facts. So under the facts of this case, you know, maybe Dr. Phillips, again, didn't need to call for assistance. But on the case where you have a bloody inmate on the floor who's still being aggressive, maybe he does need to call. The difficulty, at least in this argument, and very forceful in your point on it, very well taken, but it presents the evidence not in the light most favorable to the non-moving party in this instance. You are presenting it in just your side of it. There is evidence on the other side. And if you want us to say, well, that's so incredible it cannot possibly be true, or it's evidence that's incompetent, then maybe you need to say that. But clearly, there is evidence presented, whether it is presented immediately or later. But even within eight days, there are a couple of reports that's being made that could be construed as he didn't provide the insulin on time. And while it's very persuasive what you argue, we're not a jury. We're not the fact determinists here. So that's the problem we're having with the analysis you're giving. And you're rightly arguing very forcefully, but it does not change the fact there's some evidence on the other side. And from an appellate perspective, what do we do? Judge, when your point is very well taken, I think with the district court, what Judge Dever did was he looked at all these facts, and in his opinion, he states all the facts. He states all the facts, you know, that are favorable to Mr. Cento and favorable to the government. Did he essentially make findings of fact, is what you're saying? He made some findings and some factual determinations? No, I don't believe he made factual determinations. I think what he did, and it's important to remember, even though we're talking about facts that there are clearly some disputed facts here, but as Judge Dever held, there are facts that don't necessarily need to be resolved by a jury because for this reason. One of the elements of an Eighth Amendment claim is conduct which shocks the conscience of someone. Judge Dever found that no reasonable jury could find that Dr. Phillip in this situation or the other two defendants or appellees in this case in the other factual situations could look at their conduct and find that it shocks a jury's conscience. I think Judge Dever found that had a jury looked at this situation and the specific facts of this situation, that a jury's conscience would not be shocked if a prison doctor didn't give supplemental insulin to an angry, shouting, aggressive inmate at that time but rather followed through with orders to monitor him and have a plan in place. Well, the evidence, then that would be as a matter of law. That's not all the evidence. The evidence in the light most favorable doesn't say that. It doesn't say it's one incident. It says that he just didn't do it. He didn't do it. It wasn't the first time it happened. It happened again. And even in this instance, the question of how angry. I mean, it's one thing to say you're angry and combative, but those are just words. I mean, they don't mean anything. I mean, you've got to have some determination of what this factual situation is all about. And I don't know how you decide it as a matter of law. It makes it neat and pretty, but I'm not sure that's the way you should resolve it. I mean, Judge Devereux, it may be more likely than not that he is correct, but that's not the standard, right? We look at the evidence in the best light for the plaintiff. And if we do that, how can you grant summary judgment? Well, I think because what – and counsel for Mr. Cento pointed this out. You know, Mr. Cento has represented himself from the beginning, and this has been 10 years of litigation. There are so many facts that have come forward. It's easy to get lost in these facts. Indeed. There are some disputed facts, and I'm not going to stand up here and tell you that they're not. But the disputed facts, the facts that are in dispute, are not necessary to resolve at the summary judgment phase for the claims that have actually been asserted and are actually being argued. This is a universe. This is Mr. Cento's whole universe in prison, and he's, you know, complaining about different things and raising disputed facts, and some of them are. But focusing on his actual claim, which was, Dr. Phillip denied me treatment for my diabetes, that's simply not true as a matter of law. It's not that it's not true as a matter of the district court found the facts in favor of the prison officials. No, it's looking at this very narrow, even though there's lots of facts, this is a very narrow issue in a very narrow factual situation. I missed that point. The doctor did not deny me treatment on several occasions. It's not true as a matter of law. When the factual question is, did he deny the treatment? And to get to it not being true as a matter of law, you've got to say, no, he didn't do it. But I'm saying he did. That's a factual determination. Well, it's undisputed. I understand it well if you say, well, if you take every one of his facts, and resolve every one of them in favor of the defendant, then the legal conclusion is it will not satisfy the standards for an Eighth Amendment claim. I can understand that argument. And that's pretty easy to do. You go out there and you look exactly what he says, and then we make a term, is this something that can be resolved as a matter of law? And I'm not certain if you take his facts just like he states them in here true, that you simply say, no, it's not enough. That's really a sufficiency in terms of whether or not he's even stated the claim. Sure. But, again, I think you have to look at this, and we argued this in the brief, that at most this is a delay. It's never been a denial. Dr. Phillip has never denied Mr. Cento needed insulin. He prescribed a plan for him, and he has always followed through on that plan. But he says it's more than a delay. He says it's not just the first time. There were several times. And he does these two reports into the show, and clearly the doctor has done it in this one instance. And he says, well, that's just one instance. But if he alleges there are others and there's something else to say, possibly others, and you know there's one here, I mean, it's facts. I don't know how it's going to come out. It might be an easy case, but it's difficult at this level to say this is a case that should be settled as a matter of law. Well, again, I think, you know, as we argued in the brief, at most this is a delay case. And I mention that again to say the undisputed facts, as we know them, because we know there's a lot of disputed facts, again, but the undisputed facts can be used to decide that this is at most a delay case. Mr. Cento, although he states. . . It may only happen in one instance. Right, but he. . . Would that be enough to create a trialable issue? Well, he has always focused on this one incident. And in passing, sometimes, and I'm not exactly sure where. . . I'm saying, I'm thinking to you, if it's the delay and it only happened in this one instance, is that enough to make a trialable claim? You mean to send it back for a trial? Yeah. To make a claim of eight minutes. You've got a man who's severely diabetic, and you can establish it was a delay, and that it happened, and all those facts are there. If we. . . If all the facts are there. . . I don't know if you need an expert to say that. Most people would tell you if someone is in need of insulin, and you've got a doctor that denies him insulin, that's probably a problem. Well, I would. . . Some people see that as a problem, and the facts could bear it out to be different. You might could explain it away, or you might could deal with questions. Was he so angry that the doctor did it? Or were there other things? Did the doctor have a mental lapse? All kinds of stuff could come up. Or the doctor may testify he didn't need the supplemental insulin. Sure. But the doctor hasn't said that yet, has he? Because the record reflects we don't even know if Cento even needed the insulin when he showed up. Right. Because we never got there. But he says he did. But he. . . And no one says he didn't. But at the stage, it's his burden. . . Right. It's his burden to show that he has to assert some kind of facts that he even needed to put Dr. Phillip on notice that he even needed insulin. And Dr. Phillip, again, knows that Mr. Cento is a diabetic. But what he did not know at that time was whether he even needed supplemental insulin. Your Honors, I see my time is coming to a close in a few moments, and I'd like to address the other factual situations if there are no other further questions on that. With regard to the lockdown census count that was conducted a few days after this incident, Mr. Cento has put forth no evidence that Dr. Phillip and Susan McClintock were aware that he was suffering some sort of medical emergency. He even states in his deposition that if you take his facts as true, that he was vomiting and that he had blood all over him. He testifies in his deposition that before they arrived, he was asked a series of questions about his outward appearance. He says that he vomited and had vomit and blood on his shirt, but that before these prison officials arrived, he had taken the shirt off and put it on the floor, and that he had taken a towel and wiped himself off. So he's not put forward any evidence that Susan McClintock and Dr. Phillip were aware that he was experiencing the kind of emergency that he claims that he was experiencing. I thought I remembered in the record that they knew that he had serious, very serious medical conditions, including diabetes and hepatitis C. That is true. At least Dr. Phillip was aware that he had issues, but his... So if they saw him, as he says they did, with the blood and whatever else, they might have raised a suggestion that he needed some medical care. Sure, but I think... If they knew he had these bad medical conditions. I think your question goes to something Judge Niemeyer raised earlier, which is that Cento focused on lack of running water in his housing unit and that he used the emergency telephone to get water. And that's the evidence that when these prison officials arrived, their understanding was that he needed water and that the Eighth Amendment requires, again, that a reasonable jury could be able to look at what happened and say that this shocked the conscience. All the record evidence here does not reflect that when Dr. Phillip and Susan McClintock showed up that their actions would shock a jury's conscience, in other words, because the evidence shows that there was no outward appearance of any emergency. Mr. Cento had taken off his shirt, which had vomit. He had wiped his face, and his focus was on water. It wasn't until the district court raised and string-sided a bunch of cases which establishes that even 24 hours with inmates having no water is not an Eighth Amendment violation that he now switches to, and this is consistent in his litigation, when he's defeated on one point, he sort of changes his footing and goes somewhere else, and now it's, well, I was bloody and vomiting and they didn't treat me. But as Judge Dever looked at the record and he stated all of these facts in his opinion, decided that no reasonable jury could look at the facts and believe that these prison officials acted in an Eighth Amendment violation way. You know, I think I read a stat recently that one-third of all civil litigation in federal district courts, and especially in the Eastern District of North Carolina, are prisoner litigation cases. I think it would be a mistake to send a message to prisoners that they could make these kind of claims and change their footing throughout litigation and throw the kitchen sink at a court and require that a court conduct a trial on all these prisoner civil litigation cases. This is simply not a case that a jury needs to consider. I understand that there are a lot of disputed facts and Judge Dever recognized that also and he stated so in his opinion, but in his analysis it's correct that every disputed fact doesn't need to be resolved by a jury. And in his analysis, he did what he was required to do, which was consider whether or not those disputed facts could lead a reasonable jury to decide that Patricia Stansberry and Susan McClintock and Dr. Phillip acted in such a way that would shock their conscience. Your Honor, if there are no further questions, the government would request that the district court's decision be affirmed. Thank you. Mr. Fara? I only want to make two points and I think the rest of the points are in the brief and the court seems aware of it. It's not a delay case. The best example of that is I think at Joint Appendix 247. It's an inmate request to staff. It's addressed to Dr. Phillips. It's dated June 22, 2005 and it says in full, I request insulin coverage whenever my blood glucose levels are above 200 milligrams. Full stop. It's consistent with the prescription that Dr. Phillip deviated from previously. He submits another one in July, which is a JA 301. I submitted on June 22, 2005, I submitted six cop-outs to your requesting medical treatment for several serious medical conditions. My medical conditions remain untreated. Please answer all cop-outs and then he signs it. That's one stated July 27, 2005. The second point I'll make, you know, there's kind of this thesis in the government's argument that Mr. Sinto is trying to pull the wool over the district court. Mr. Sinto took four depositions in this case and if the government is really convinced that he is manipulating the court in order to get his claim in front of a jury, which I don't think juries are terribly sympathetic to prisoners anyway, then I think the resolution should have been that the government should have joined Mr. Sinto's motion at the outset to appoint counsel for him, which the district court denied, and asked counsel to assess and vet his claim so that they're clearly presented to the district court and so that government counsel may have the opportunity to negotiate with somebody who is not an angry inmate, who's obviously very irritated at the prison officials. I think that's a very clean way of doing it and as a court-appointed attorney myself, I think that there are benefits to doing that for the bar. Can you address briefly the situation which your colleague ended on, the business about the blood and the... The water was taken away and that was bad. And then he switched to this treatment claim. I think if you read his testimony, the testimony unfolds as follows. He says that he used the emergency telephone line. He said, listen, the water's been turned off. I'm in severe pain. I'm vomiting. I'm vomiting blood. That's the description that we pull in the brief that he then gives to the correctional officer. The correctional officer then calls in Dr. Derek Phillip, the camp administrator, et cetera. They respond. He says in his testimony, I told them what the circumstances were. I had been, et cetera, et cetera, et cetera. And then he says two things happened. One, Dr. Phillip looked at him in disgust, that's a quotation, and turns away. And camp administrator McClintock orders another correctional officer to throw him in the shoe. And that's kind of full stop. I agree that water was a part of it because it was on lockdown, but his claim was also that I needed an assessment of my medical condition before that happened, and I told them, or at least tried to tell them, but they didn't even give me the shot. They threw me in the shoe. Thank you very much. Thank you, Mr. Parr. I notice you're court-appointed, and I just want to recognize your service to the court and your client, of course. Thank you. We'll come down and greet counsel. I'm going to take a short recess. Okay.
judges: Paul V. Niemeyer, Diana Gribbon Motz, James A. Wynn Jr.